69 P.3d 510

Braden TRUST, Plaintiff–Appellee,

v.

The COUNTY OF YUMA, Arizona,
a political subdivision of the State
of Arizona, Defendant–Appellant.

No. 1 CA–CV 01–0415.

Court of Appeals of Arizona,
Division 1, Department C.

June 3, 2003.

Byrne, Benesch & Villarreal, PC By Arturo I. Villarreal, Wayne C. Benesch, Yuma, Attorneys for Appellee.

Patricia A. Orozco, Yuma County Attorney By Gregory T. Torok, Deputy County Attorney, Yuma, Attorneys for Appellant.

## OPINION

HALL, Judge.

¶ 1 Braden Trust planned to construct farm-worker housing on its farm and believed that under state law it was not required to obtain building permits from Yuma County for the construction. The County disagreed. The trial court ruled that Braden Trust is exempt from the permit requirements because the farm-worker housing is incidental to farming and agriculture. For the reasons discussed below, we affirm the judgment.

## BACKGROUND

¶ 2 Braden Trust owns farm property in Yuma County known as Texas Hill Farms. Braden Trust approached the Yuma County Department of Development Services about renovating farm dwellings and constructing structures for farm-worker housing at Texas Hill Farms. Officials of the department informed Braden Trust that any building of and/or renovations to residential structures were subject to the building permit process and to the requirements of the Yuma County Building Code.

¶ 3 Braden Trust believes that under Arizona Revised Statutes ("A.R.S.") sections 11–830(A)(2) and 11–865 (2001), the County building code does not apply to the construction and renovation of residential quarters at its farm because farm-worker housing is incidental to farming and agriculture. Braden Trust filed a complaint for special action, mandamus and declaratory judgment, and sought an order directing the County to exempt Braden Trust from complying with the building permit process and building code with regard to existing and planned residential buildings.

¶ 4 The parties stipulated that (1) Texas Hill Farms consists of approximately 7,500 acres of farm land and is substantially engaged in the business of agriculture with its land dedicated wholly to farm use; (2) the proposed farm-worker housing is approximately 60 miles east of Yuma and 30 miles from the nearest available housing; and (3) the tenants of the farm-worker housing would be significantly involved in farm operations at Texas Hill Farms and would be compensated for farm labor. At the hearing on the complaint, the new facilities to house farm workers at Texas Hill Farms were described as two steel structures containing studio apartments. Each apartment would have two beds, a bath, and a kitchenette. According to the general manager of the farm, the purpose of the apartments would be to house tractor drivers and irrigation employees at no charge to them; the apartments would not be rented out and would be vacant during the off-season. He testified that family members of the farm workers would be allowed to live on the property with the worker even if the family members were employed elsewhere.

¶ 5 Curtis Cansler, chief building official for the County, testified that in the Uniform Building Code, which the County had adopted, agricultural buildings are defined as structures for such uses as farm implements and grain storage, not for human occupancy. He believed that for purposes of §§ 11–830 and 11–865, the proposed apartment buildings are residential rather than agricultural.

¶ 6 The court ruled that the project to build farm-worker housing at Texas Hill Farms constituted construction incidental to farming and agriculture and thus was not subject to the County building and zoning codes. It entered a declaratory judgment ordering the County to allow Braden Trust to construct farm-worker housing free from interference and from any requirements to comply with the County building or zoning codes. The County timely appealed from the judgment. We have jurisdiction under A.R.S. § 12–2101(B) (1994).

## ANALYSIS

### A. Standard of Review

¶ 7 The issue in this appeal is whether the trial court correctly interpreted

§§ 11–830 and 11–865 to mean that residential structures built on a farm to house farm workers are exempt from county zoning and building codes. The primary inquiry is whether these statutes are intended to exempt such structures. The basic facts relevant to the application of the statutes, *i.e.,* that Texas Hill Farms is a farm of more than five acres and that the proposed housing is furnished rent-free for workers on the farm, are not disputed. We review de novo whether the trial court correctly applied the substantive law to the facts. *Hobson v. Mid-Century Ins. Co.,* 199 Ariz. 525, 528, ¶ 6, 19 P.3d 1241, 1244 (App.2001).

### B. Interpretation and Application of the Statutes

¶ 8 The two statutes at issue are found in Title 11, Chapter 6, which concerns county planning and zoning. Section 11–830(A)(2) provides:

A. Nothing contained in any ordinance authorized by this chapter shall:

. . . .

2. Prevent, restrict or otherwise regulate the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agricultural purposes, if the tract concerned is five or more contiguous commercial acres.

Section 11–865(A)(1), which deals specifically with building codes, provides:

A. The provisions of this article shall not be construed to apply to:

1. Construction or operation incidental to . . . farming, dairying, agriculture, viti-culture, horticulture or stock or poultry raising. . . .

¶ 9 The County argues that the common-sense meanings of the phrases "use or occupation of land or improvements for . . . general agricultural purposes" and "[c]onstruction or operation incidental to . . . agriculture" do not encompass multifamily residential dwellings. The County reads the relevant statutes as exempting only structures that house such things as agricultural products, farm implements, or tools—not people. In the County's view, farm-worker

housing has its own function independent of agricultural purposes and is not intended to serve agriculture purposes, as distinguished, for example, from a barn. Likewise, the County asserts, farm-worker housing is not incidental to agriculture because such housing is neither a by-product of nor causally related to agriculture.

¶ 10 Braden Trust argues in response that its farm-worker housing both serves "general agricultural purposes" and is "incidental to agriculture" because the occupants of the apartments will be employed full-time on the farm and because providing the full-time employees with on-site housing relieves them of the burden of driving long distances to and from work, which keeps them well-rested and able to work. Braden Trust notes that courts in other jurisdictions that have considered the application of similar statutes to farm-worker housing have all concluded that such dwellings are exempt from zoning and/or building codes.

¶ 11 The cardinal rule in statutory interpretation is to ascertain and give effect to the intent of the legislature. *Abbott v. City of Tempe,* 129 Ariz. 273, 275, 630 P.2d 569, 571 (App.1981). A statute's language is "the best and most reliable index" of its meaning. *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). Arizona courts will interpret a statute contrary to its seemingly plain meaning "only if necessary to effectuate the legislature's clearly expressed contrary intent or to avoid an absurd result that the legislature could not in any event have intended." *Ariz. Dept. of Revenue v. Gen. Motors Acceptance Corp.,* 188 Ariz. 441, 444, 937 P.2d 363, 366 (App.1996). Further, we assume that the legislature accords words their natural and obvious meanings unless otherwise stated. *State v. Jones,* 188 Ariz. 388, 392, 937 P.2d 310, 314 (1997); *see also* A.R.S. § 1–213 (2002) ("Words and phrases shall be construed according to the common and approved use of the language.").

¶ 12 We begin by noting that terms used in the two statutes are quite broad in their scope and application. Under § 11–830(A)(2), county zoning and building codes may not "[p]revent, restrict or otherwise regulate the use or occupation of land or

improvements for … general agricultural purposes." Although the phrase "general agricultural purposes" is not defined in the planning and zoning statutes, other statutes illustrate the broad scope of the concept. For example, in the valuation of "agricultural property" for taxation purposes, "residential dwellings that are maintained for occupancy by agricultural employees as a condition of employment or as a convenience to employer" are valued as agricultural land. A.R.S. § 42–12004(A)(6) (Supp. 2002) (requiring valuation pursuant to A.R.S. Title 42, Chapter 13, Article 3, which provides for the valuation of agricultural property).

¶ 13 Further, in the context of agricultural employment relations, A.R.S. §§ 23–1381 to –1395 (1995), " '[a]griculture' means all services performed on a farm as defined in § 23–603, including but not limited to the recruiting, housing and feeding of persons employed or to be employed as agricultural employees by agricultural employers." A.R.S. § 23–1382(3) (1995).

¶ 14 Section 11–865(A)(1) also contains similarly broad language that building codes "shall not be construed to apply to … [c]onstruction or operation incidental to … farming … [or] agriculture." "Incidental" is generally defined as "[s]ubordinate to something of greater importance; having a minor role," Black's Law Dictionary 765 (7th ed.1990), "happening in fortuitous or subordinate conjunction with something else," The Random House Dictionary 444 (1980), and "being likely to ensue as a chance or minor consequence," Webster's Ninth New Collegiate Dictionary 609 (1987).

¶ 15 Thus, "construction or operation" that is "incidental" to farming or agriculture does not necessarily involve the primary functions of the farm but, instead, may concern functions that are tangentially related to the principal activity of the farm. On-site housing for full-time farm workers can be said to be "incidental" to farming because housing the workers on the farm is a subordinate accommodation to their primary role as employees and because free, on-site housing arguably benefits both the employer and the workers in terms of safety and productiv-

ity. Because the statutory language is broad enough to include farm-worker housing and the statutes at issue do not preclude residential dwellings from the exemption from county zoning and building codes, we conclude that on-site dwellings for farm workers, like those proposed by Braden Trust, fall within the provisions of §§ 11–830(A)(2) and 11–865(A)(1).

¶ 16 Our conclusion is consistent with decisions by courts from other states that have determined that farm housing is incidental to farming or agriculture and/or that it serves an agricultural purpose. In *Town of Lysander v. Hafner*, 96 N.Y.2d 558, 733 N.Y.S.2d 358, 759 N.E.2d 356, 357 (2001), the defendants attempted to install several single-wide mobile homes for housing migrant workers on a farm. The mobile homes did not comply with a town zoning ordinance requiring a minimum living area of 1,100 square feet in all one-story single-family dwellings. *Id.* The issue was whether the zoning ordinance was superseded by an Agriculture and Markets Law that provided that local governments "shall not unreasonably restrict or regulate farm operations within agricultural districts in contravention of the purposes of this article unless it can be shown that the public health or safety is threatened." *Id.* The statute defined "farm operations" as "the land and on-farm buildings, equipment and practices which contribute to the production, preparation and marketing of crops, livestock and livestock products as a commercial enterprise." *Id.*

¶ 17 The lower courts had ruled that the statute did not provide any protection to farm residential buildings and thus enjoined the defendants from using mobile homes without building permits and certificates of occupancy. *Id.* at 358. The court of appeals reversed the lower courts and ordered the granting of summary judgment in favor of the defendants. *Id.* at 359. The court noted that the literal language of the definition of "farm operation" did not exclude farm residential buildings from the protection of the statute. *Id.* at 358. "To the contrary," stated the court, the statute made it "plain that *all* buildings located 'on-farm' may be considered part of a 'farm operation' if they other-

wise satisfy the requirements of the statute." *Id.* The court gave deference to the views of the State Commissioner of Agriculture and Markets, who appeared amicus curiae on the defendants' behalf and stated:

> Frequently, farmers rely on mobile home housing for their farm laborers to accommodate the long work day, seasonal housing needs and to address the real shortage of rental housing in rural areas. Local government prohibitions or restrictions on the use of mobile homes can significantly impair the viability of farm operations.

*Id.* at 359.

¶ 18 In *County of De Kalb v. Vidmar,* 251 Ill.App.3d 419, 190 Ill.Dec. 667, 622 N.E.2d 77, 78 (1993), the defendants placed two mobile homes on their farm property and began to construct additions to connect the mobile homes. The county posted a "stop work" order at the site because they had not obtained a building permit for the construction. *Id.* The defendants disregarded the order, completed the construction, and began residing in the structure along with three farm employees. *Id.* When charged by the county with violating various building ordinances, the defendants claimed that they were not required to obtain any permits because the state statute that authorized counties to regulate construction excluded buildings that were "for agricultural purposes on farms including farm residences." *Id.* at 78–79. Nonetheless, the county argued "that a structure used as a residence is not used for an agricultural purpose, even if it is on agricultural land and used by a person engaged in agriculture." *Id.* at 79.

¶ 19 The court acknowledged that the agricultural use exemption from county regulation should not "be manipulated and twisted into a protection for virtually any use of the land as long as some agricultural activity [is] maintained on the property," *id.* at 79 (quoting *County of Kendall v. Aurora Nat'l Bank Trust No. 1107,* 170 Ill.App.3d 212, 120 Ill. Dec. 497, 524 N.E.2d 262 (1988)), but rejected the county's argument that "residing on a farm is not a 'farm residence' or that living in a structure to promote a full-time business of farming is not an 'agricultural purpose.'" *Id.* at 79–80. Accordingly, the court deter-

mined that the mobile homes constituted a farm residence for agricultural purposes and that the defendants were therefore exempted from the county code regulations. *Id.* at 80. *See also County of Kendall v. Husler,* 44 Ill.App.3d 1013, 3 Ill.Dec. 652, 358 N.E.2d 1337 (1977) (landowner could maintain mobile home on his farm property under exception to zoning ordinance, which provided that mobile home could be maintained on agricultural land when occupant was substantially engaged in business of agriculture, even though land was being farmed by others because landowner oversaw farming operation).

¶ 20 In *Blauvelt v. Board of County Commissioners of Leavenworth County,* 227 Kan. 110, 605 P.2d 132, 133 (1980), the Kansas Supreme Court considered whether a dwelling located on a farm and occupied by the owner-farmer served an agricultural purpose and, therefore, was exempt from county zoning regulations and building permit requirements. The statute at issue provided that no zoning regulation "shall be held to apply to the use of land for agricultural purposes, nor for the erection or maintenance of buildings thereon for such purposes so long as such land and buildings erected thereon are used for agricultural purposes and not otherwise." *Id.* at 133.

¶ 21 The county argued that "the use of a house is purely a residential purpose while other structures on a farm, such as barns, silos, pigpens, etc., are used for agricultural purposes." *Id.* at 134. The *Blauvelt* court disagreed, concluding that, because the property involved was obviously an agricultural unit occupied by the farmer-owner who intended to live and carry on "agricultural purposes" on the land, it could not say that the home of the farmer was not within the contemplation of "agricultural purposes" as set forth in the statute. *Id.* at 135. Commenting on the policy of the statute, the court stated that the law's obvious purpose "was to favor agricultural uses and farmers." *Id.* It continued, noting, "[s]ince this state's economy is based largely on the family farm it would appear the intent of the legislature was to spare the farmer from more governmental regulation and not to discourage the

development of this state's farm industry." *Id.*

¶ 22 The County relies on *State v. Huffman*, 20 Ohio App.2d 263, 253 N.E.2d 812 (1969), to support its claim that housing is not incidental to farming. The farmer in *Huffman* was convicted of violating a township zoning ordinance for allowing a tenant to place his mobile home on the farmer's land. *Id.* at 814. In lieu of rent, the tenant, who had a full-time regular job, performed part-time work on the farm consisting of tasks such as repairing a barn, weeding, and driving farm machinery. *Id.* at 816–17. The farmer contended that, as a matter of law, the mobile home was a permitted use pursuant to an exemption for structures incident to agricultural use. *Id.* at 816. The court disagreed because "[w]hether this arrangement was one for a situs for a dwelling with rent paid in occasional labor or one for farm labor induced by free rent of a place for a mobile home" was a question of fact and the trial court's determination that the use of the mobile home was not incidental to the agricultural use of the land was supported by the evidence that the mobile home was used primarily as a dwelling and not to "entice farm labor or to make available living quarters for farm labor." *Id.* at 817.

¶ 23 Given the undisputed facts in this case that the proposed housing will be used as "living quarters for farm labor[,]" *Huffman* lends no support to the County's position. Indeed, in dicta, the court commented, by way of contrast: "Nor is [this] a case of supplying housing for seasonal migrant labor." *Id.* Thus, viewed in context, *Huffman* actually supports the trial court's ruling.

¶ 24 Given the broad language of §§ 11–830 and 11–865, the implicit legislative intent to aid agriculture in Arizona, and the reasoning of courts in other states, we conclude that the farm-worker housing proposed by Braden Trust is exempt from the requirements of the County's zoning and building codes. We do not share the County's concern that if a residential dwelling unit is deemed to be used for general agricultural purposes, then any building, including a school, restaurant, movie theater, liquor store, or adult-oriented business, could be used for agricultural purposes as long as it serves a farmer or farm workers. In any event, these uses are not before us, and the County has presented no evidence that such uses have ever been considered to be incidental to agriculture. Therefore, we are not swayed by the County's speculation.

## C. Equal Protection

¶ 25 Following oral argument, the parties submitted supplemental briefs on the issue whether treating farm workers differently from other workers whose employers provide housing violates the equal protection clauses of both the Arizona and United States Constitutions. *See* Ariz. Const. art. 2, § 13; U.S. Const. amend. XIV, § 1. These guarantees, which are essentially the same in effect, *State v. Bonnewell,* 196 Ariz. 592, 596, ¶ 15, 2 P.3d 682, 686 (App.1999), "require that all persons subject to state legislation shall be treated alike under similar circumstances." *Crerand v. State,* 176 Ariz. 149, 151, 859 P.2d 772, 774 (App.1993). Equal protection considerations do not prohibit unequal treatment between people of different classes as long as the classification is reasonable. *Shelby Sch. v. Ariz. State Bd. of Ed.,* 192 Ariz. 156, 169, ¶ 65, 962 P.2d 230, 243 (App. 1998); *State v. Beckerman,* 168 Ariz. 451, 453, 814 P.2d 1388, 1390 (App.1991).

¶ 26 The County asserts that the relevant class for purposes of equal protection analysis is all workers whose employers provide housing and who reside in counties that have adopted building codes. According to the County, § 11–865(A)(1) discriminates against the subclass of workers employed in agriculture because the statute deprives them of "the minimum life, safety and health requirements and inspections provided by the building code."

¶ 27 Braden Trust argues that the County is not entitled to attack the constitutionality of the statute on equal protection grounds. We agree. Being neither a "citizen" under Article 2, Section 13 of the Arizona Constitution nor a "person" within the meaning of the Fourteenth Amendment to the United States Constitution, the County may not assert an equal protection claim.

278

See, e.g., City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency, 625 F.2d 231, 233 (9th Cir.1980) (claims properly dismissed because "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment"); City of New York v. Richardson, 473 F.2d 923, 929 (2d Cir.1973) (same); Town of Tortolita v. Napolitano, 199 Ariz. 556, 560–61, ¶ 17, 20 P.3d 599, 603–04 (App.2001) (municipality has no Fourteenth Amendment right to assert). Even if the County were entitled to invoke equal protection guarantees on behalf of "farm workers" generally, it failed to raise the issue in the trial court and has therefore waived it on appeal. See, e.g., State v. Mills, 196 Ariz. 269, 274, ¶ 22, 995 P.2d 705, 710 (App.1999) (finding waiver of equal protection argument initially raised on appeal).

■ ¶ 28 Furthermore, neither § 11–830(A)(2) nor § 11–865(A)(1) denies farm workers equal protection because these statutes, which exempt a broad array of entities that collectively comprise the agricultural industry from complying with zoning and building code requirements, are not directed at farm workers per se, let alone farm workers of any particular racial or ethnic background. See Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.").

## CONCLUSION

¶ 29 Given the broad language of the statutes at issue, it is clear that the legislature has decided to favor agriculture by limiting governmental controls on farm property. It is not in the court's power to change legislative enactments; our duty is to interpret the law and apply it as written. Jennings v. Woods, 194 Ariz. 314, 316, ¶ 4, 982 P.2d 274, 276 (1999); see also Giss v. Jordan, 82 Ariz. 152, 159, 309 P.2d 779, 784, (1957) ("The questions of the wisdom, justice, policy or expediency of a statute are for the legislature alone."). If residential dwellings are to be excluded from the application of the statutory exemption, that change must come from the legislature.

¶ 30 In summary, we conclude that the exemptions from county zoning and building codes provided for in §§ 11–830(A)(2) and 11–865(A)(1) apply to the farm-worker housing at Texas Hill Farms. Accordingly, we affirm the trial court judgment.

CONCURRING: DANIEL A. BARKER, Judge and SUSAN A. EHRLICH, Presiding Judge.